WERNER E. TIRRE and EVELYN K. TIRRE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tirre v. Commissioner
Docket No. 4838-73.
United States Tax Court
T.C. Memo 1978-298; 1978 Tax Ct. Memo LEXIS 222; 37 T.C.M. (CCH) 1243; T.C.M. (RIA) 78298; July 31, 1978, Filed John Kennedy Lynch, for the petitioners. Larry L. Nameroff, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax [1] Year
Deficiency
under Sec. 6653(b)
1962
$ 4,541.00
$ 2,270.50
1963
4,945.89
2,472.95
1964
5,833.94
2,916.97
1965
41,835.31
20,917.66
*223 The sole issue remaining for decision is whether, and to what extent, petitioners understated their taxable income for the years 1962 through 1965. The parties have stipulated that if there are any underpayments in tax, they are due to fraud, a concession by petitioners which eliminates our consideration of their claim that any deficiencies are barred by the statute of limitations. See section 6501(c)(1). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners, Werner E. Tirre and Evelyn K. Tirre, are individuals who resided in Barrington, Illinois, at the time their petition in this case was filed. They timely filed joint Federal income tax returns on a cash basis for the taxable years under consideration with the District Director of Internal Revenue for Cleveland, Ohio. [2]
Beginning in March of 1961, and continuing through March 31, 1966, petitioner was employed *224 by Cedar Point, Inc. (CPI) an amusement and recreational park located on Lake Erie in Sandusky, Ohio. Petitioner was originally hired by CPI as its comptroller. He later became an officer of the company, serving as the assistant treasurer beginning sometime in 1962, and from 1963 as its treasurer. Prior to coming to CPI, petitioner was employed in California at Disneyland. Petitioner was hired by CPI at a time when the company was experiencing severe financial problems. He assisted in the reorganization of the CPI operation by providing financial and administrative expertise. He was not offered a written employment contract when initially employed. Later, as treasurer of CPI, petitioner was the chief financial officer of the corporation and possessed broad authority regarding its financial affairs. He was eventually given a three year written contract of employment by CPI. This contract expired as of April 1, 1966, and was not renewed by the company. During the course of his employment with CPI, petitioner misappropriated corporate funds. Petitioner's misappropriations were discovered during an annual audit of the corporate books and records undertaken by CPI's accounting *225 firm following the close of CPI's 1966 fiscal year. The results of the portion of the audit dealing with the misappropriations are summarized for CPI's fiscal years 1962-1966 as follows: AMOUNTS FYE
MISAPPROPRIATED
3/31/66
$ 40,966.54
3/31/65
21,477.98
3/31/64
16,606.39
3/31/63
8,468.97
3/31/62
1,784.26
$ 89,304.14
The discovery of the misappropriations did not occur until after petitioner's employment with CPI had been terminated. Petitioner employed several methods in misappropriating funds from CPI. The basic methods are briefly described as follows: 1. Change Fund. CPI maintained an impresent change fund at various fixed dollar amounts (exceeding $ 100,000) during its operating season. This fund was maintained because the cash requirements of the recreational park operated by CPI were substantial. In the day-to-day operation of the park, the total receipts for each day would be commingled with the change fund. The fixed operating dollar amount was retained for the next day's business. The remaining portion of the commingled fund, which amount equalled the day's receipts, would then be deposited to the corporate bank account. *226 From time to time, petitioner withdrew cash from the change fund. His usual practice was to substitute an IOU or a personal check in the amount of the cash withdrawal. [3] To redeem his IOU or check, petitioner would produce a bank deposit slip evidencing a deposit made to the regular CPI bank account. Petitioner would then represent to the person in charge of the change fund that he, petitioner, was the source of the funds deposited to the CPI account, claiming a credit against the amounts previously withdrawn from the change fund and the return of his IOU's and checks in an equivalent amount. In fact, the deposits which petitioner clained were repayments of his prior withdrawals frequently consisted of checks made payable to CPI by third parties that were received by petitioner and merely endorsed with the CPI stamp for deposit. *227 2. Personal Account. CPI maintained a general ledger account for advances to officers and employees. Petitioner received advances and had outstanding balances which became significant at times during the 1966 fiscal year. Occasionally petitioner claimed payment on his personal account in a manner similar to that used by him in connection with the change fund, i.e., by furnishing receipted deposit slips to the corporate accounting department and informing them that this deposit was a payment by him on his personal account when the deposit actually consisted of checks payable to CPI. During the fiscal year ended March 31, 1965, petitioner also authorized the writing off of a personal account balance in the amount of $ 2,276. It was later determined, upon detailed analysis, that the $ 2,276 was the balance due at that time from petitioner. The amount of cash misappropriated by petitioner through the deposit of checks payable to CPI in corporate accounts for the benefit of petitioner with respect to his personal account and the change fund is as follows: FUNDS FYE
MISAPPROPRIATED
3/31/66
$ 32,248.11
3/31/65
10,084.09
3/31/64
12,129.84
3. Petty *228 Cash . Petitioner made numerous unauthorized and unsupported withdrawals from petty cash while employed by CPI. The amounts of these unauthorized withdrawals are as follows: FYE
AMOUNT
3/31/66
$ 8,100
3/31/65
2,890
3/31/64
300
3/31/63
250
4. Unsupported Disbursement Checks. Petitioner received disbursement checks from CPI in the amounts of $ 4,176.55 and $ 6,227.89 for the fiscal years 1964 and 1965, respectively, for which the accountants were unable to locate any supporting data during their audit. 5. Imprest Payroll Checks. CPI maintained a separate bank account for the payment of its payroll of nonsalaried employees. This account was funded each payday by the deposit of a single check drawn on the general corporate bank account in the exact amount of the total of all the individual hourly paychecks. During the period from November, 1961, to January, 1963, eight of the general account checks intended for deposit in the payroll account were cashed by petitioner. Petitioner covered the general account checks intended for payroll that he cashed by depositing to the payroll account a combination of checks made payable to CPI from third *229 parties and his own personal checks in amounts sufficient to balance the payroll account. The net amount misappropriated by petitioner in this manner totalled $ 7,619.79. 6. Miscellaneous Items. During the fiscal year 1966, petitioner had charged to CPI $ 618.43 in personal expenditures. In addition to the various misappropriations resulting in the cash shortages described above, petitioner also engaged in an extensive lapping operation during the 1965 and 1966 fiscal years. [4] Under this lapping operation, a total amount of $ 274,921.85 of CPI funds were temporarily diverted for petitioner's personal use and later refunded by petitioner. Between January 1, 1966 and March 31, 1966, petitioner transferred $ 132,306.26 to CPI in repayment of such funds. Petitioner was confronted with the preliminary audit findings regarding the shortages in various CPI accounts at a May 3, 1966 meeting attended by CPI's management, attorney, and accountants. At this meeting, petitioner admitted that he had misappropriated *230 CPI funds, and signed the following statement prepared by counsel for CPI: I acknowledge that there are certain shortages in my accounts at Cedar Point, Inc. arising out of the diversion by me of funds of that Company to my own use. The exact amount of such shortages cannot be presently determined and is subject to a complete audit. However, the shortages as presently known amount to $ 28,106.39. I hereby agree to make prompt restitution to Cedar Point, Inc. in the amount of $ 28,106.39 and further to make restitution of any additional amounts which may be determined by the above-mentioned audit to be owing by me. I also agree to pay Cedar Point interest at the rate of 5% per annum on all amounts owing by me to Cedar Point, Inc. from time to time and to pay the expense of the above-mentioned audit. I also release Cedar Point, Inc., its officers, directors, agents, attorneys and auditors from any and all liability to me, my heirs and assigns arising out of my employment by Cedar Point, Inc. or the termination of such employment. Petitioner maintained no records of his withdrawals from CPI accounts, misappropriations, and related activities. However, he did acknowledge each *231 additional amount which the continuing audit disclosed subsequent to the May 3, 1966, meeting as having been diverted by him. The total amount of funds misappropriated by petitioner was eventually determined to equal $ 89,304.14. Petitioner refunded $ 25,106.39 of this amount in three payments made during 1966. He also executed, on October 24, 1966, a promissory note in the amount of $ 50,000 payable to the Insurance Company of North America in settlement of its claim against petitioner as surety for CPI in the amount of $ 58,214.33. Finally, petitioner refunded during 1967 $ 16,481.54 of the remaining amount of $ 19,444.62 owed to CPI, which sum was evidenced by three promissory notes executed by petitioner on February 16, 1967. [5]
On his joint Federal income tax returns for the years 1962 through 1965, petitioner reported income and losses from various sources, including: salary from CPI, a bookkeeping and accounting service, a business of leasing slenderizing equipment, *232 a management consulting service, an automotive lease rental business, dividends, interest, transactions involving the purchase and sale of securities, rents, a marine sales and service facility, and various partnership interests. None of the funds misappropriated by petitioner from CPI remaining unpaid upon petitioner's termination of employment with CPI were reported as income by petitioner during any of the years in issue. Petitioner reported taxable income for the years 1962 through 1965, respectively, in the following amounts: $ 4,256.35, $ 6,616.15, $ 5,859.05, and $ 3,222.77. The respondent redetermined petitioner's taxable income for the years in issue by the net worth plus non-deductible expenditures method. The following is a summary of petitioner's assets, liabilities and adjustments to net worth, for the period 1962 through 1965: 12/31/61
12/31/62
12/31/63
12/31/64
12/31/65
Assets: Cash in transit
$ 0.00
$ 0.00
$ 1,400.00
$ 0.00
$ 0.00
Cash in banks
18,338.23
903.73
( 715.20)
1,071.44
16,640.89
Accounts receivable
0.00
0.00
288.25
0.00
51,995.73
Partnership capital
accounts
0.00
0.00
0.00
0.00
44,539.81
Stocks and Bonds
100.00
2,680.00
6,721.75
31,193.75
89,844.02
Automobiles
5,117.23
5,220.00
7,371.00
10,221.00
5,719.00
Furniture and Equipment
4,319.90
6,896.02
8,110.33
8,684.71
31,009.95
Residence - Autumn Drive
32,977.53
55,772.80
57,136.15
57,236.15
0.00
Residence - Timber Lane
0.00
0.00
0.00
23,564.43
102,690.83
Total Assets
$ 60,852.89
$ 71,472.55
$ 80,312.28
$ 131,971.48
$ 342,440.23
Liabilities: Accounts payable
$ 40.01
$ 433.05
$ 1,456.50
$ 3,999.50
$ 44,066.88
Notes payable
19,577.24
16,038.88
11,792.29
46,334.45
116,341.97
Mortgage payable
35,000.00
34,637.60
38,209.09
37,138.07
46,376.89
Reserve for Depreciation
2,314.90
2,083.10
2,404.07
4,156.16
3,485.75
Total Liabilities
$ 56,932.15
$ 53,192.63
$ 53,861.95
$ 91,628.18
$ 210,271.49
Net Worth
$ 3,920.74
$ 18,279.92
$ 26,450.33
$ 40,343.30
$ 132,168.74
Net Worth - Prior Year
3,920.74
18,279.92
26,450.33
40,343.30
Increase in Net Worth
14,359.18
8,170.41
13,892.97
91,825.41
Plus: Income Tax Paid
750.00
1,706.40
957.50
1,300.00
Personal Living Expense
14,424.21
21,284.24
22,052.12
38,927.11
Loss on Sale of Automobile
1.83
569.42
0.00
935.64
Less: Income Tax Refund
(1,149.64)
0.00
0.00
0.00
Nonrecognized Gain
0.00
0.00
0.00
(2,280.10)
Dividend Exclusion
0.00
0.00
0.00
( 200.00)
Business Expenses
(1,013.73)
(1,426.11)
(2,946.29)
(5,670.10)
Adjusted Gross Income
27,371.85
30,304.36
33,956.30
124,837.96
Less: Itemized deductions
and exemptions
7,062.90
7,547.14
7,809.32
11,239.21
Corrected Taxable Income
$ 20,308.95
$ 22,757.22
$ 26,146.98
$ 113,598.75
*233 OPINION Respondent has determined petitioner's taxable income for the years 1962 through 1965 utilizing the net worth and nondeductible expenditures method. Respondent has also asserted the fraud penalty against petitioner in each of these years. In using the net worth method, respondent first attempts to establish the taxpayer's net worth at the beginning of a given year. He then computes increases in the taxpayer's net worth in each succeeding year under examination by calculating the difference in the taxpayer's net worth at the beginning and the end of each year. To these increases certain adjustments are made including the addition of nondeductible expenditures, such as living expenses. If the total increases in net worth are substantially greater than the taxable income as reported by the taxpayer, respondent claims the excess is unreported taxable income, unless it can be traced to a nontaxable source (such as a cash hoard, gifts, inheritances, etc.). In the instant case, the parties agree that all items reflected in the respondent's determination of net worth and nondeductible expenditures are accurate. However, petitioner maintains that the respondent's net *234 worth computation is inadequate because it fails to take into account amounts of cash petitioner had on hand the beginning of 1962, certain nontaxable sources of increases in net worth, and additional liabilities to CPI. [6] The parties have also stipulated that the fraud penalty will be applicable to any underpayments in each of these years before the Court. We have considered petitioner's objections to the adequacy of respondent's net worth determination, and have concluded, for the reasons discussed below, that these objections must be rejected. Cash on Hand
Petitioner claims that respondent's computation overstates their actual net worth increases because *235 it reflects no cash on hand at the beginning of 1962. We believe, however, that respondent's computation is both complete and accurate in this respect. Petitioner has simply not produced evidence sufficient to satisfy this Court that there was any cash on hand at the beginning of 1962 which was not reflected in respondent's determination. The special agent who was responsible for the construction of respondent's net worth statement testified that during the investigation petitioner stated that he did not deal in cash and did not have large cash deposits on hand in 1962.In addition, the special agent indicated that petitioner had no objections to the items relating to cash when asked to review respondent's figures. Petitioner testified that he had $ 1,500 to $ 2,000 in a box somewhere, and that this amount was not reflected in respondent's determination. This testimony, however, was vague, unsupported by any corroborative evidence, self-serving, and not entirely credible. Its lack of credibility is further enforced by the conflicting testimony of the special agent. On balance, we conclude that petitioner has failed to establish the existence of cash in excess of that reflected *236 in respondent's determination. [7]
Nontaxable Sources of Net Worth Increases
The only evidence in the record suggesting the possible existence of nontaxable sources of increases in net worth relates to petitioner's ownership of a one-quarter interest in a business operated in Germany by petitioner's father. Petitioner testified that he annually received from his parents during the years 1962 through 1965 between $ 1,500 and $ 2,000 out of the business. However, he presented no checks, receipts or other records pertaining to these funds, and was vague regarding the time, amounts, and medium in which these payments were allegedly made. Furthermore, he failed to adequately explain the circumstances surrounding these alleged payments and their character as either taxable income (which, if so, was not reported on the tax returns) *237 or return of capital. We therefore reject as without adequate support in the record this alleged nontaxable source of net worth increases. Liabilities to CPI
During the course of his employment at CPI, petitioner used and misappropriated substantial amounts of corporate funds. It is petitioner's contention that these amounts constituted corporate loans to petitioner and should therefore be recognized as additional liabilities to CPI for purposes of the net worth determination. Respondent, on the other hand, denies that these amounts may be characterized as loans, contending they were misappropriations taxable under the principles of . It is now well settled that funds wrongfully obtained by a taxpayer through misappropriation or embezzlement constitute taxable income to the taxpayers at the time of the misappropriation. See , in which the Supreme Court held that amounts embezzled by an employee from his employer constituted gross income to the employee under section 61(a) in the years of embezzlement. In discussing the scope of the statutory term "gross income, *238 " the Court stated in part: When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." * * * In such case, the taxpayer has "actual command over the property taxed--the actual benefit for which the tax is paid," Corliss v. Bowers, supra. This standard brings wrongful appropriations within the broad sweep of "gross income"; it excludes loans. [] Petitioner contends that the principle of the James case is not applicable here. He contends that there was a consensual recognition, at the time of the use or misappropriation of corporate funds, of an obligation to repay the funds to CPI, and that the amounts diverted should be considered as amounts loaned or advanced. Petitioner argues that at all times he recognized his obligation to repay CPI, and that this intention to repay is further evidenced by his repayment *239 of most of the funds diverted prior to his leaving the employ of CPI. Moreover, petitioner points to various corporate acts which he claims evidence CPI's recognition of his obligation to repay as that of a borrower, not an embezzler. We cannot agree with petitioner. At the time the funds were diverted there was no knowledge on the part of the employer of the diversions. Such corporate acts as the acceptance of promissory notes from petitioner executed after discovery of the diversions or the charging of interest on the amounts owed to it do not, as petitioner contends, constitute a consensual recognition during the years in issue of an obligation to repay nor evidence that CPI considered the amounts diverted as loans. Rather, such acts reflect CPI's realistic appraisal of the situation once discovered, and its decision to minimize its financial losses. CPI certainly could not be a consenting party to a debtor-creditor relationship prior to its having knowledge of that relationship. Furthermore, no contemporaneous notes or agreements were executed with respect to the funds diverted. The fact that the petitioner replaced the funds taken from the change fund with personal checks *240 or IOU's does not constitute such contemporaneous recognition of an obligation. The petitioner deliberately acted to conceal the diversions of funds during the special audits conducted regarding the change fund. Also, these IOU's and checks were not given recognition by petitioner because they served as mere parts of a more sophisticated misappropriation involving the granting of credit to petitioner on his accounts for deposits of checks payable to CPI, for which there were no such notes or other evidence of indebtedness. Under these circumstances, there could not possibly have been any express or implied consent on the part of the employer to the diversions. See . Moreover, petitioner's denials or convenient lack of knowledge respecting the sums misappropriated until confronted with the facts is completely imcompatible with petitioner's assertion that he recognized an obligation to repay and that the funds misappropriated were merely loans. Petitioner relies upon , as support for his position that we should recognize increased liabilities *241 to CPI for purposes of the net worth determination. In Merrill, executor's fees were mistakenly paid in 1939 and 1940. During 1940, the mistake was discovered and entries made on the books of the executor reflecting the liability for the overpayment. The Court held that as to the fees both mistakenly paid and discovered in 1940, the bookkeeping entry recognizing liability for repayment in that same year was sufficient to exempt the monies from being taxable income. Such is not the case here because of our finding that there was no consensual recognition of indebtedness by either CPI or petitioner in the years the funds were taken. Moreover, the aspect of Merrill upon which petitioner relies has been expressly rejected by the Seventh Circuit in , affg. , the Circuit to which appeal lies in this case. , affd. , cert. denied . See also , revg. . *242 Finally, petitioner maintains that the refund of $ 132,306.26 to CPI during the first three months of 1966, prior to any discovery of his misappropriation of corporate funds, requires the recognition of a liability to CPI in that amount as of December 31, 1965. This argument fails for two reasons. First, we note that the $ 132,306.26 included monies attributable to petitioner's lapping operation. Accordingly, this amount represents a cumulative total of monies used and repaid by petitioner during these three months. During this period, the excess of petitioner's total withdrawals over the total amount covered by the lapping operation almost certainly never, at any one point in time, approximated $ 132,306.26. An examination of respondent's net worth statement, as stipulated by the parties, supports the conclusion that at least some portion of the $ 132,306.26 must have come from corporate funds appropriated during 1966 because the statement contains no likely source of liquid assets approaching in magnitude the $ 132,306.26 refunded. In this connection, we are unable to determine what portion, if any, of the $ 132,306.26 simply represents amounts both misappropriated and *243 returned in 1966 rather than repayments by petitioner of amounts misappropriated prior to 1966. [8]
More significantly, petitioner has not persuaded us that the requisite consensual recognition of a liability existed at the end of the calendar year 1965 as to any amounts appropriated prior to 1966. Even though some of the amounts taken prior to January 1, 1966 may *244 have been refunded shortly thereafter, this was simply a feature of petitioner's lapping operations rather than recognition of a consensual obligation to repay. It was not until May of 1966, when petitioner's house of cards came tumbling down that there was any action that might be termed a consensual obligation to repay. The facts in this case illustrate a problem occurring in the application of , a problem which is accentuated because petitioner's and CPI's taxable years did not coincide, one being on a calendar year the other on a fiscal year. The best accounting estimate of the funds misappropriated by petitioner during his employment by CPI, including the first three months of 1966, was $ 89,304.14. Respondent's calculation of the increase in petitioner's taxable income over the 4 years ending December 31, 1965, is $ 162,757.58, most of which increase is attributable to amounts misappropriated from CPI. Despite this discrepancy of $ 73,453.44 (apparently attributable to amounts returned during the first three months of 1966), the James doctrine, as interpreted by this and other courts, requires the inclusion of *245 $ 162,757.58 in petitioner's taxable income over the 4 years, even though taxpayers seldom will receive an equivalent tax benefit from the deductions allowed for repayment. See, e.g., ; . We seriously doubt whether the subsequent deductions available to petitioner will provide much solace for the harsh result occasioned by the strict application of James. But although we sympathize with petitioner's circumstances, the law is clear and it is our duty to apply it. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Since Evelyn K. Tirre is a party to this proceeding solely by virtue of having filed joint returns with her spouse, Werner E. Tirre will be referred to as petitioner.↩
3. Petitioner's withdrawals of cash from the change fund were not consistent with regular corporate procedures. Moreover, petitioner's use of the substantial cash fund was not discovered during the course of his employment with CPI, even though special audits of the change fund were conducted from time to time during the years 1962 through 1965. Petitioner, by reason of his position as comptroller or treasurer, was advised in advance that the special audits were to be conducted and he promptly took actions to replenish the cash fund and remove the evidence of withdrawals.↩
4. Lapping, simply stated, involved petitioner's use of one check payable to CPI to cover the prior deposit for his benefit of another check payable to CPI.↩
5. Because of interest charges and a special audit fee incurred by CPI due to the misappropriations, petitioner eventually became obligated to pay CPI an amount considerably in excess of $ 89,304.14.↩
6. Petitioner at one time asserted that some personal living expenses were not properly reflected on the net worth statement. The record in this respect is seriously deficient, but we find that respondent was reasonable in his allowances for petitioner's living expenses. To the extent that petitioner contends that some of his travel expenses were for business and were not accurately accounted for by respondent in the net worth statement, we find the record to be an insufficient basis for any such judgment.↩
7. The controversy relates to the $ 1,500 to $ 2,100 in a box somewhere, not to any amount petitioner may have been carrying on his person. Although petitioner undoubtedly had some cash in his wallet at the end of 1961, there is nothing to show that whatever minimal amount was involved did not remain constant at the end of each of the years in issue.↩
8. Respondent has determined an increase in petitioner's taxable income over the 4 years totalling $ 162,757.58. When this amount is compared to the total amount of corporate funds misappropriated by petitioner over the 5 years he was employed by CPI, or $ 89,304.14, we note a difference of $ 73,453.44. To account for this difference, it is possible to speculate that an amount in the neighborhood of $ 73,453.44 was repaid or refunded to CPI during 1966 with respect to funds misappropriated prior to 1966. Therefore, the difference between $ 132,306.26, the amounts refunded during the first 3 months of 1966 under the lapping operation, and the $ 73,453.44, or $ 58,852.82 (some amount in this neighborhood), would serve as an estimate of the amounts misappropriated and repaid by petitioner during the first 3 months of 1966.↩